Case No. 13-60754

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

GORDON VANCE JUSTICE, JR.; SHARON BYNUM; MATTHEW JOHNSON; ALISON KINNAMAN; AND STANLEY O'DELL;

*Plaintiffs-Appellees,*

v.

DELBERT HOSEMANN, in his official capacity as Mississippi Secretary of State; and JAMES M. HOOD, III, in his official capacity as Attorney General of the State of Mississippi,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

---

## BRIEF OF PLAINTIFFS-APPELLEES

---

Paul V. Avelar
INSTITUTE FOR JUSTICE
398 South Mill Avenue, Suite 301
Tempe, AZ  85281
(480) 557-8300

Diana K. Simpson
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA  22203
(703) 682-9320

Russell Latino, III
WELLS MARBLE & HURST, PLLC
300 Concourse Boulevard, Suite 200
Ridgeland, MS  39157
(601) 605-6900

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PARTIES

No. 13-60754: *Gordon Vance Justice, Jr., et al. v. Delbert Hosemann, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees**

      Gordon Vance Justice, Jr.
      Sharon Bynum
      Matthew Johnson
      Alison Kinnaman
      Stanley O'Dell

**Counsel for Plaintiffs-Appellees**

      INSTITUTE FOR JUSTICE
            Paul V. Avelar
            Diana K. Simpson
            Steven M. Simpson (former)

      WELLS MARBLE & HURST, PLLC
            Russell Latino, III

**Defendants-Appellants**

      Delbert Hosemann, Mississippi Secretary of State
      James M. Hood, III, Attorney General of the State of Mississippi

**Counsel for Defendants-Appellants**

      Harold E. Pizzetta, III, Assistant Attorney General, State of Mississippi

**Listed by Defendants-Appellants**

      Kim Turner, Assistant Secretary of State, Office of the Secretary of State

***Amicus Curiae* in Support of Defendants-Appellants**

> THE CAMPAIGN LEGAL CENTER
> > J. Gerald Hebert
> > Paul S. Ryan
> > Megan McAllen

Plaintiffs-Appellees are not subsidiaries or affiliates of a publicly owned corporation, and no publicly owned corporation, not a party to the litigation, has a financial interest in the outcome of this case.

Dated this 31st day of March, 2014.

> By: s/ Paul V. Avelar
> Paul V. Avelar
> Counsel of record for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees respectfully request oral argument as this case presents novel and complex questions of constitutional law, including the limits the First Amendment imposes on the government's power to regulate grassroots political speakers.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ...........................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF CONTENTS...........................................................iv

TABLE OF AUTHORITIES ........................................................ viii

STATEMENT OF JURISDICTION....................................................1

STATEMENT OF THE ISSUES.....................................................2

STATEMENT OF THE CASE.......................................................3

    I.      Procedural History.................................................3

    II.     Facts.............................................................4

         A.     Plaintiffs And Their Speech....................................4

         B.     Mississippi's Campaign Finance Laws.......................7

              1.     Overlapping and Conflicting Statutes ..............................7

              2.     Formation and Registration Requirements......................8

              3.     Tracking and Reporting Contributions and Expenditures ....................................................9

              4.     Chapter 17 Accounting and Reporting ...........................10

              5.     Chapter 15 Accounting and Reporting ...........................11

              6.     Mississippi Guidance Documents and Forms ................13

                  a.     Campaign Finance Guidance Documents............14

                  b.     Campaign Finance Forms.....................................15

7.    Penalties ....................................................... 16

C.    Real-World Effects Of Mississippi's Scheme ......................... 17

    1.    Atlee Breland and Parents Against Personhood............. 17

    2.    No 2011 Committee Complied With the Requirements ................................................ 19

D.    Expert Evidence And Published Research............................... 19

STANDARD OF REVIEW ...................................................... 20

SUMMARY OF ARGUMENT ............................................... 21

ARGUMENT ........................................................................ 23

I.    The district court's conclusion that Mississippi's campaign finance scheme is unconstitutional as applied to small groups and individuals like Plaintiffs is amply supported by the record and precedent........................................................................ 23

A.    The district court correctly held that Plaintiffs have standing to raise their as-applied challenge; *Worley* is inconsistent with Fifth Circuit law........................................... 23

    1.    The district court properly found that Plaintiffs were sufficiently exact in describing their activities to establish standing........................................ 24

    2.    *Worley* does not apply here and is contrary to Fifth Circuit law. .................................................. 26

B.    The district court correctly rejected "wholly without rationality" review.................................................................. 29

C.    The district court correctly held that the burdens Mississippi imposes on small ballot measure groups and individuals cannot withstand exacting scrutiny......................... 32

    1.    Exacting Scrutiny.......................................... 32

2.  The burdens of Mississippi's scheme are substantial and fall heaviest on small groups like Plaintiffs.............33

    a.  Red-Tape Burdens...............................................33

    b.  Fear of Disclosure .................................................38

3.  The State's interest is at a "low ebb" here......................40

    a.  The informational interest does not apply with any force to small groups and individuals............40

    b.  Similar cases in other circuits all favor Plaintiffs. .............................................................42

    c.  The cases relied on by the State are not small ballot measure group cases...................................44

II.  This Court should affirm by holding that the district court should have applied strict scrutiny and rejected the informational interest ...45

A.  This Court should apply strict scrutiny to Mississippi's PAC burdens, as required by *Citizens United* ..........................46

1.  *Citizens United* requires application of strict scrutiny ...46

2.  PAC burdens are not mere "disclosure" laws ................48

3.  *Citizens United*'s holding cannot be distinguished ........49

B.  The informational interest does not justify disclosure in ballot measure speech ..............................................................52

1.  The informational interest is neither compelling nor important in ballot measure elections ......................53

2.  Fifth Circuit precedent since *McIntyre* is silent as to the informational interest in ballot measure elections..........55

3.  Those cases calling the informational interest in ballot measure elections "important" have ignored *McIntyre*..56

C.    No evidence supports the assumption that mandatory
        disclosure helps voters. ............................................................58

CONCLUSION ...................................................................................................62

CERTIFICATE OF FILING AND SERVICE… ....................................................64

CERTIFICATE OF COMPLIANCE.......................................................................65

# TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                          **PAGE**

*Ariz. Free Enterprise Club's Freedom Club PAC v. Bennett*,
  131 S. Ct. 2806 (2011)......................................................................60

*Asgeirsson v. Abbott*, 696 F.3d 454 (5th Cir. 2012) ..........................................30, 32

*Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519 (1947)...........................37

*Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729 (2011) .....................................60

*Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982) ................54

*Buckley v. Am. Const. Law Found.*, 525 U.S. 182 (1999) .................................30, 54

*Buckley v. Valeo*, 424 U.S. 1 (1976) ................................................................ *passim*

*Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003).............44, 57

*Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*,
  556 F.3d 1021 (9th Cir. 2009) ..........................................................41, 42, 43

*Cent. Pines Land Co. v. United States*, 274 F.3d 881 (5th Cir. 2001).....................24

*Chamber of Commerce of the U.S. v. Moore*, 288 F.3d 187 (5th Cir. 2002) ..........32

*Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981)................54

*Citizens United v. FEC*, 558 U.S. 310 (2010)...................................................*passim*

*City of Hous. v. Hill*, 482 U.S. 451 (1987) .............................................................38

*Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655 (5th Cir. 2006).............28

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012).....41, 43, 56

*Davis v. FEC*, 554 U.S. 724 (2008) ........................................................................30

*Doe v. Reed*, 130 S. Ct. 2811 (2010) ....................................................33, 53, 54, 55

*Dunagin v. Oxford*, 718 F.2d 738 (5th Cir. 1983) ..................................................20

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...................................................................58

*EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606 (5th Cir. 2009).....................20

*Family PAC v. McKenna* 685 F.3d 800 (9th Cir. 2012) ........................30, 31, 43, 57

*FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238 (1986)....................34, 35, 38, 49

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978)..................................40, 54

*Hart v. Hairston*, 343 F.3d 762 (5th Cir. 2003)........................................................5

*Hatchett v. Barland*, 816 F. Supp. 2d 583 (E.D. Wis. 2011).......................27, 28, 44

*Hernandez v. Velasquez*, 522 F.3d 556 (5th Cir. 2008)...........................................20

*Hous. Chronicle Publ'g Co. v. City of League City*,
    488 F.3d 613 (5th Cir. 2007) ..................................................................25, 27

*Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010) ...............44

*Justice for All v. Faulkner*, 410 F.3d 760 (5th Cir. 2005) .......................................56

*Let's Help Fla. v. McCrary*, 621 F.2d 195 (5th Cir. 1980) ...............................40, 55

*Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D. Wash.
    2011), *aff'd in part, vacated*, No. 11-36008, 520 F. App'x 517 (9th Cir.
    2013) ............................................................................................................24

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ...........................*passim*

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) ...............................................................*passim*

*N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008) .............................35

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ..........................................39

*Nat'l Org. for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011)............................44

*Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34 (1st Cir. 2012)....................44

*Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377 (2000)............................................58

*Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010) ...................................*passim*

*Steffel v. Thompson*, 415 U.S. 452 (1974) ...............................................................24

*Swaffer v. Cane*, 610 F. Supp. 2d 962 (E.D. Wis. 2009)..........................................44

*Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013) .......21

*Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983) .................................19, 20

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ............................................58

*United States v. Harriss*, 347 U.S. 612 (1954) ........................................................56

*Worley v. Cruz-Bustillo*, 717 F.3d 1238 (11th Cir. 2013) ...............................*passim*

## STATUTES

### Federal

2 U.S.C. § 434(f)......................................................................................................48

42 U.S.C. § 1983........................................................................................................1

28 U.S.C. § 1291........................................................................................................1

### Mississippi

Miss. Code Ann. § 23-15-801(c) ......................................................................7, 8, 34

Miss. Code Ann. § 23-15-801(e) .........................................................................9, 17

Miss. Code Ann. § 23-15-801(f).........................................................................9, 10

Miss. Code Ann. § 23-15-801(g) ........................................................12, 13

Miss. Code Ann. § 23-15-803 .............................................................35, 48

Miss. Code Ann. § 23-15-803(a) .....................................................9, 34, 47

Miss. Code Ann. § 23-15-803(b) ..........................................................9, 34

Miss. Code Ann. § 23-15-803(c) ...........................................................9, 14

Miss. Code Ann. § 23-15-807 ...................................................................39

Miss. Code Ann. § 23-15-807(a) ..............................................................15

Miss. Code Ann. § 23-15-807(b) ...................................................11, 12, 35

Miss. Code Ann. § 23-15-807(d) ...................................................12, 13, 35

Miss. Code Ann. § 23-15-811(a) ........................................................16, 35

Miss. Code Ann. § 23-15-813(a) ........................................................16, 35

Miss. Code Ann. § 23-17-1(1) ...................................................................7

Miss. Code Ann. § 23-17-47(a) ...........................................................9, 17

Miss. Code Ann. § 23-17-47(c) .............................................................7, 34

Miss. Code Ann. § 23-17-47(d) ..................................................................9

Miss. Code Ann. § 23-17-49 .....................................................9, 14, 35, 48

Miss. Code Ann. § 23-17-49(1) ...............................................8, 9, 34, 47

Miss. Code Ann. § 23-17-49(2) .....................................................9, 34, 38

Miss. Code Ann. § 23-17-51 ...............................................................10, 35

Miss. Code Ann. § 23-17-51(1) ..................................................................8

Miss. Code Ann. § 23-17-51(2) .................................................................51

Miss. Code Ann. § 23-17-51(3) ...........................................................15, 51

Miss. Code Ann. § 23-17-51(4) ...........................................................16, 35

Miss. Code Ann. § 23-17-53.................................................................35, 38

Miss. Code Ann. § 23-17-53(a) ...............................................10, 11, 39, 51

Miss. Code Ann. § 23-17-53(b) ...............................................10, 11, 15, 16

Miss. Code Ann. § 23-17-53(c) ...................................................11, 34, 51

Miss. Code Ann. § 23-17-61....................................................................16, 35

## RULES

Fed. R. App. P. 10(a) ...........................................................................19, 20

## OTHER

David M. Primo, *Information at the Margin: Campaign Finance Disclosure Laws, Ballot Issues, and Voter Knowledge*, 12 Election L.J. 114 (2013) .........20, 60

Dick Carpenter and Jeffrey Milyo, *The Public's Right to Know Versus Compelled Speech: What Does Social Science Research Tell Us About the Benefits and Costs of Campaign Finance Disclosure in Non-Candidate Elections?*, 40 Fordham Urb. L.J. 603 (2012)....................................................20, 36, 39, 61

Elizabeth Garrett, *Voting with Cues*, 37 U. Rich. L. Rev. 1011 (2003) .................59

Supp. Reply Br. for the Appellee, *Citizens United v. FEC*, (2010) (No. 08-205) ................................................................................................51

xii

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this constitutional challenge to a state statute under 42 U.S.C. § 1983.  RE.5; ROA.14.  The district court issued a final judgment disposing of all claims on September 30, 2013.  RE.3; ROA.2290, .2334. Defendants-Appellants filed a timely notice of appeal on October 17, 2013.  RE.2; ROA.2332.  This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

Under Mississippi law, grassroots citizen groups and individuals who wish to fund independent political speech promoting or opposing ballot measures are subject to extensive and confusing regulations as "political committees" that chill their speech.  The questions presented on appeal are:

1. Did the district court err in determining that Mississippi's imposition of political-committee burdens on small groups and individuals that advocate the passage or defeat of ballot measures violates the First Amendment?

2. Did the district court err in determining that exacting scrutiny, rather than strict scrutiny or wholly without rationality review, applies to Mississippi laws that impose political-committee burdens on individuals and groups that advocate the passage or defeat of ballot measures?

3. Did the district court err in accepting the government's alleged "informational interest" as applied to individuals and groups that advocate the passage or defeat of ballot measures?

## STATEMENT OF THE CASE

### I.    Procedural History

This is a constitutional challenge to provisions of Mississippi law that regulate grassroots groups and individuals that promote or oppose the passage of ballot measures.  Plaintiffs filed their complaint for declaratory and injunctive relief in October 2011.  ROA.13.  In November 2011, the district court denied Plaintiffs' motion for preliminary injunction.  ROA.409.  Following discovery, the parties filed cross-motions for summary judgment.  Defendants-Appellants ("the State") also filed a motion to strike testimony of the Plaintiffs' expert witness and a summary of voluminous evidence.  The district court heard argument on all motions on February 6, 2013.  ROA.2431.  The district court ordered supplemental briefing and, after completion of that briefing, on September 30, 2013, issued a final decision denying the State's motion for summary judgment and granting summary judgment to Plaintiffs on their as-applied claims.  ROA.2291.

The district court's decision addressed various legal issues, several of which are questions of first impression in this Court.  First, the court determined that the challenged statutes implicated First Amendment rights and were subject to exacting scrutiny, rather than strict scrutiny or wholly without rationality review.  Second, the court found that Mississippi's political committee requirements could be constitutionally applied to some groups based on the State's informational

interest.  But, third, the court found that those requirements violated the First Amendment as applied to small groups and individuals that wish to speak about ballot measures.  Because the district court did not need to consider Plaintiffs' expert evidence or summary of voluminous evidence, the court denied the State's motions to strike that evidence as moot.

## II.    Facts

Plaintiffs' political speech and association have been and continue to be limited by Mississippi's campaign finance laws (§ II.A, *infra*).  These complicated laws force formal formation, registration, record-keeping, and reporting requirements on Plaintiffs and speakers like them (§ II.B.1-5, 7, *infra*).  Indeed, these laws are so complex that the State itself cannot consistently interpret them, gives erroneous guidance to speakers about them, and cannot make its own forms consistent with them (§ II.B.6, *infra*).  These laws have real-world, negative effects on Mississippians' ability to talk about salient political issues of the day (§ II.C, *infra*).  Not only do these laws impose significant costs on would-be speakers, they provide virtually no informational benefits to voters (§ II.D, *infra*), the only interest they purport to further.

### A.    Plaintiffs And Their Speech

Plaintiffs Vance Justice, Sharon Bynum, Matt Johnson, Alison Kinnaman, and Stan O'Dell are like-minded friends and neighbors in Oxford, Mississippi.

ROA.15-17.[1]  One issue about which Plaintiffs feel strongly is property rights, and,

specifically, the impact of eminent domain on those rights.  ROA.18.  During the

2011 election, Plaintiffs therefore supported the passage of Initiative 31, a ballot

measure to amend the Mississippi Constitution, because it was a "strong deterrent"

to eminent domain abuse.  ROA.18, .590.

Plaintiffs are "a small, informal group of lay persons."  ROA.25.  They have

been meeting regularly for a few years in their homes, at restaurants, and wherever

else is convenient, as a group and with others, to discuss political and legal issues

of the day.  ROA.17.  "They have no formal organization or structure, no officers

or directors, no bank account, and no member dues."  ROA.17.  They are not

experienced campaign organizers or politicians.  ROA.25.  But they have,

individually and as a group, engaged in political activities and activism.  ROA.17-

18, .25.  To fund these activities, Plaintiffs literally "pass the hat" at their meeting

to pool their money.  ROA.18.

Plaintiffs, however, curtailed their political activities in support of Initiative

31 because of Mississippi's campaign finance laws.  ROA.27.  It is impossible for

individuals or groups to engage in more than a bare minimum of speech—$200

worth—before being subjected to Mississippi's campaign finance scheme.  Had

---

[1] "On summary judgment, factual allegations set forth in a verified complaint may
be treated the same as when they are contained in an affidavit." *Hart v. Hairston*,
343 F.3d 762, 765 (5th Cir. 2003).

Plaintiffs crossed the $200 threshold, they "would have to spend a great deal of time reviewing and complying with the campaign finance laws and the regulations that apply to political committees and to them as individuals." ROA.25.

The burdens imposed on Plaintiffs once they exceeded the threshold caused them to "carefully monitor their spending to make sure they stay[ed] below" the threshold. ROA.27. Plaintiffs wanted to purchase a quarter-page advertisement in their local newspaper, but it was impossible to do so and remain under the $200 threshold. ROA.24, .27. Plaintiffs also wanted to buy posters and flyers to speak about Initiative 31, but had to limit the number they bought to stay under the threshold. ROA.24-25, .27. It was impossible for Plaintiffs to purchase more than 50 posters without exceeding the $200 threshold. ROA.24-25. Any posters that Plaintiffs did buy necessarily decreased the already small number of flyers they could make while staying under the $200 threshold. ROA.25, .27. Plaintiffs thus curtailed their own speech because of Mississippi's campaign finance laws.

The burdens of Mississippi's campaign finance laws curtailed Plaintiffs' speech during the 2011 election and continue to do so. Plaintiffs want to be able to spend their own money, associate freely with one another and with others, and speak out about future ballot measures without fear or threat of being prosecuted or investigated for violating the campaign finance laws. ROA.28-29. So long as Mississippi's statutory scheme remains in place, Plaintiffs will continue to curtail

their political association and the amount of political speech they engage in regarding ballot measures.  ROA.28-29.

### B.     Mississippi's Campaign Finance Laws

Had Plaintiffs not limited their speech to stay below the threshold, they would have been forced into a regulatory scheme so confusing that not even the State understands it.

### 1.     Overlapping and Conflicting Statutes

Because Plaintiffs wanted to speak about an initiated constitutional amendment ballot measure, there are two separate but overlapping sets of regulations they were subject to.  Under Title 23, Chapter 17 of the Mississippi Code ("Chapter 17"), Plaintiffs would be a political committee.  Miss. Code Ann. § 23-17-47(c) ("any person, other than an individual, who receives contributions or makes expenditures for the purpose of influencing the passage or defeat of a measure on the ballot").[2]  Under Title 23, Chapter 15 of the Mississippi Code ("Chapter 15"), Plaintiffs would also be a political committee.  *Id.* § 23-15-801(c) (any "groups of persons or affiliated organizations" receiving contributions or making expenditures in excess of $200 "for the purpose of influencing or

---

[2] "Measure" is an amendment to the Mississippi Constitution proposed by a petition of qualified voters.  Miss. Code Ann. § 23-17-1(1).

attempting to influence the action of voters for or against" any "balloted

measures").[3]

Whether Plaintiffs were to be regulated under both chapters, as indicated by

the plain statutory language and the State's own documents, or solely under

Chapter 17, as the State now argues, does not matter for purposes of Plaintiffs'

claims. Indeed the district court made no finding on this point. *See* ROA.2314-16.

Under either or both chapters, Plaintiffs would have been subjected to formal

formation, registration, record-keeping, and reporting requirements that have been

recognized as complex and substantial burdens on speech. That there are two

chapters that apply—and even the State is unsure how they apply—simply

heightens the complexity of the regulatory scheme. *See* ROA.2316 ("potential

speakers might well require legal counsel to determine which regulations even

apply, above and beyond how to comport with those requirements"). There are

important differences between the chapters that create traps for the unwary.

### 2.     Formation and Registration Requirements

Under both chapters, a group of individuals becomes a political committee

subject to registration, reporting, and disclosure requirements once they raise or

spend more than $200 in "contributions" or "expenditures." Miss. Code Ann.

§§ 23-15-801(c), 23-17-49(1), 23-17-51(1). Within ten days of exceeding $200 in

---

[3] Chapter 15 does not define or otherwise limit the phrase "balloted measures."

either contributions or expenditures, they must file a statement of organization, which must include the names and addresses of the committee and its officers and designate its director and treasurer. *Id.* §§ 23-15-803(a)&(b), 23-17-49(1)&(2). Chapter 15 requires committees to report changes in the information contained in the statement of organization with the next regularly scheduled filing. *Id.* § 23-15-803(c). Chapter 17, on the other hand, requires committees to report these changes within ten days. *Id.* § 23-17-49.

### 3.    Tracking and Reporting Contributions and Expenditures

Both chapters define "contribution" and "expenditure" to include anything of value that is given or received for the purpose of influencing the outcome of an election, including not just money, but also "in-kind" goods and services. *See* Miss. Code Ann. §§ 23-15-801(e)&(f), 23-17-47(a)&(d). But the definitions vary in important ways.

As to "contributions," Chapter 15 exempts "the value of services provided without compensation by any individual who volunteers on behalf of a . . . political committee." *Id.* § 23-15-801(e)(ii). By contrast, Chapter 17 exempts only "noncompensated, nonreimbursed volunteer *personal* services." *Id.* § 23-17-47(a) (emphasis added). Thus, volunteered professional services are not contributions under Chapter 15, but are under Chapter 17.

As to "expenditures," Chapter 15 exempts "any news story, commentary or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication." *Id.* § 23-15-801(f)(ii). But Chapter 17 has no such "media exemption." Thus, an editorial in a local newspaper advocating for a particular ballot measure may or may not be a reportable expenditure, depending on which statutory provision is applied.

### 4.    Chapter 17 Accounting and Reporting

Under Chapter 17, political committees and individuals who raise or spend more than $200 must file monthly reports. Miss. Code Ann. § 23-17-51. Political committees must report, and therefore keep accounting and records of the:

- "name, address and telephone number of the committee or individual person filing the statement";

- "total amount of contributions received during the period covered by the financial report;"

- "total amount of expenditures made during the period covered by the financial report;"

- "cumulative amount of those totals for each measure;"

- "balance of cash and cash equivalents on hand at the beginning and the end of the period covered by the financial report;"

- "total amount of contributions received during the period covered by the financial report from persons who contributed Two Hundred Dollars ($200.00) or less, and the cumulative amount of that total for each measure;"

- "total amount of contributions received during the period covered by the financial report from persons who contributed Two Hundred Dollars ($200.00) or more, and the cumulative amount of that total for each measure; and"

- "name and street address of each person from whom a contribution(s) exceeding Two Hundred Dollars ($200.00) was received during the period covered by the financial report, together with the amount contributed, the date of receipt, and the cumulative amount contributed by that person for each measure."

*Id.* § 23-17-53(a)&(b).

Individuals must report, and therefore keep accounting and records of the:

- "name, address and telephone number of the committee or individual person filing the statement";

- "total amount of expenditures made during the period covered by the financial report;"

- "cumulative amount of that total for each measure;"

- "name and street address of each person to whom expenditures totaling Two Hundred Dollars ($200.00) or more were made, together with the amount of each separate expenditure to each person during the period covered by the financial report and the purpose of the expenditure[;] and"

- "total amount of contributions received during the period covered by the financial report, the cumulative amount of that total for each measure, and the name and street address of each person who contributed more than Two Hundred Dollars ($200.00) and the amount contributed."

*Id.* § 23-17-53(a)&(c).

### 5. Chapter 15 Accounting and Reporting

Under Chapter 15, political committees that pass the $200 threshold must file three kinds of reports. Miss. Code Ann. § 23-15-807(b). The pre-election

report is required in any calendar year during which there is a regularly scheduled

election and must be filed by the seventh day before the election. *Id.* § 23-15-

807(b)(i).  Periodic reports are due in "1987 and every fourth year thereafter," and

must be filed "no later than the tenth day after April 30, May 31, June 30,

September 30 and December 31." *Id.* § 23-15-807(b)(ii).[4]  In years not covered by

the periodic reports, committees must file annual reports covering that calendar

year, which are due no later than January 31 of the following calendar year. *Id.*

§ 23-15-807(b)(iii).

 For pre-election, periodic, and annual reports, committees must report, and

therefore must keep accounting and records of:

- "For the reporting period and the calendar year, the total amount of all contributions and the total amount of all expenditures of the candidate or reporting committee which shall include those required to be identified pursuant to item (ii) of this paragraph as well as the total of all other contributions and expenditures during the calendar year.  Such reports shall be cumulative during the calendar year to which they relate;"

- The name, mailing address, occupation, and name of the employer of "[e]ach person or political committee who makes a contribution to the reporting candidate or political committee during the reporting period, whose contribution or contributions within the calendar year have an aggregate amount or value in excess of Two Hundred Dollars ($200.00) together with the date and amount of any such contribution;"

---

[4] Thus, periodic reports were last due in 2011 and will not be required again until 2015.  Mississippi's 2012 Campaign Finance Guide erroneously states that periodic reports were also due in 2012.  ROA.505.

- The name, mailing address, occupation, and name of the employer of "[e]ach person or organization, candidate or political committee who receives an expenditure, payment or other transfer from the reporting candidate, political committee or its agent, employee, designee, contractor, consultant or other person or persons acting in its behalf during the reporting period when the expenditure, payment or other transfer to such person, organization, candidate or political committee within the calendar year have an aggregate value or amount in excess of Two Hundred Dollars ($200.00) together with the date and amount of such expenditure"; and

- "The total amount of cash on hand of each reporting candidate and reporting political committee."

*Id.* § 23-15-807(d)(i)-(iii); *see also id.* § 23-15-801(g) (defining "identification").

Chapter 15 does not require reporting by individuals speaking about ballot measures.

### 6.   Mississippi Guidance Documents and Forms

The State portrays its statutory scheme as nothing more than a series of simple forms and negligible requirements.  Brief of Defendants-Appellants ("State Br.") 14.  But the State's own guidance documents and forms fail to comport with the statutory requirements.  The district court made no findings as to whether the guidance documents and forms complied with state law, but rather found (as Plaintiffs have argued) that the guidance documents and forms demonstrate that the statutory scheme is not simple or straightforward.  ROA.2315 n.4.

### a.    Campaign Finance Guidance Documents

The Secretary of State's Constitutional Initiative Citizen's Guide outlines the initiative process, from registering the initiative and placing a measure on the ballot through the general election.  ROA.563.  The Initiative Guide includes less than one page about campaign finance requirements, warns that "[n]o attempt to include all campaign finance disclosure requirements is made in this publication," and refers speakers to the Secretary of State's Campaign Finance Guide. ROA.572.

Both the 2011 and 2012 versions of the Campaign Finance Guide fail to provide any guidance on Chapter 17 requirements, even though the State now asserts that speakers like Plaintiffs are only subject to Chapter 17.  Both guides direct all political committees to file the Chapter 15 reports (periodic, pre-election, and annual), rather than Chapter 17 (monthly) reports.  ROA.505, .537.  Both guides include a reporting schedule for the respective year, but only for Chapter 15 reports, not Chapter 17 reports.  *Id.*  Both guides direct political committees to update the information with the next campaign finance filing, as Chapter 15 requires, rather than within ten days, as Chapter 17 requires.  *Compare* Miss. Code Ann. § 23-17-49 *with id.* § 23-15-803(c) *and* ROA.512, .543.  Both documents state that "*all* candidates and *all* political committees" are required to file a termination report to end reporting requirements, as required by Chapter 15, even

14

though Chapter 17 reporting requirements cease when contributions and expenditures cease except that a further post-election report is also required. *Compare* Miss. Code Ann. § 23-17-51(3) *with id.* § 23-15-807(a) *and* ROA.505, .537.

### b.    Campaign Finance Forms

As summarized in the tables below, Mississippi's campaign finance forms also misconstrue or misrepresent many regulations foisted on Plaintiffs.

| Monthly Reporting Form, ROA.497 | |
|---|---|
| Chapter 17 says: | But the form requires: |
| *cumulative* contributions and expenditures to be reported, Miss. Code Ann. § 23-17-53(b)(iii) | calendar year-to-date figures for contributions and expenditures to be reported |
| balances of cash-on-hand at the beginning of the period *and* at the end of the reporting period, *id.* § 23-17-53(b)(iv) | only one figure for cash-on-hand |
| cumulative amount of contributions received from persons who contributed $200 or less for *the life of the measure*, *id.* § 23-17-53(b)(v) | sum of contributions received during the *period* from persons who contributed $200 or less |
| only the "total amount of expenditures made during the period," and the cumulative amount of expenditures, *id.* § 23-17-53(b)(ii)&(iii) | expenditures as "itemized" or "non-itemized," i.e., those greater than and less than $200 |

| Itemized Receipt Form, ROA.588 | |
|---|---|
| Chapter 17 says: | But the form requires: |
| disclose name and street address of contributors exceeding $200, *id.* § 23-17-53(b)(vii)&(c)(iv) | disclose name and street address *and also* employer and occupation of contributors exceeding $200 |
| disclose "each person from whom a contribution(s) exceeding Two Hundred Dollars ($200.00) was received during the period covered by the financial report," i.e., the month reported, *id.* § 23-17-53(b)(vii)&(c)(iv) | disclose each person who has contributed more than $200 in the aggregate, during the year-to-date |

A speaker who completely fills out the forms provided to her by the State in her effort to comply will nonetheless fail to meet the statutory requirements. As the district court explained, this is "significant" because "even if a potential advocate follows the state's own instructions, he or she might nonetheless be fearful of a failure to comport." ROA.2314.

### 7.    Penalties

A wilful violation of Chapter 15 is a criminal offense, subject to imprisonment for six months and a fine of $3,000. Miss. Code Ann. § 23-15-811(a). *Any* violation of Chapter 17 is a criminal offense, subject to imprisonment of one year and a fine of $1,000. *Id.* § 23-17-61. Additionally, individuals and committees failing to file a report are subject to civil penalties up to $500 per report. *Id.* §§ 23-15-813(a), 23-17-51(4).

### C.     Real-World Effects Of Mississippi's Scheme

Plaintiffs submitted evidence from and about groups that had tried to abide by Mississippi's regulatory scheme during the 2011 election.  This evidence further demonstrated that Mississippi's scheme is complex, difficult to comply with, and chills protected First Amendment speech and association.

#### 1.     Atlee Breland and Parents Against Personhood

Atlee Breland is a Mississippi mother of three who spoke out in 2011 against Initiative 26, the Personhood Initiative, because she was concerned that the measure would prevent infertility treatment.  ROA.622-25.  She never intended to conduct "traditional political campaigning," but she created a website to inform people about what she perceived as the unintended consequences of the measure.  ROA.625, .630-31.  She learned that she might be subject to Mississippi's campaign finance laws because of her website from an acquaintance who urged her to call the Secretary of State's office.  ROA.631-33.  Upon placing that call, Ms. Breland discovered that "because [she is] a professional computer programmer, all of the activity that [she does] related to website design and production would be considered in-kind contributions."  ROA.635.[5]  The money Ms. Breland spent

---

[5] This would be true under Chapter 17, but not under Chapter 15.  *Compare* Miss. Code Ann. § 23-17-47(a) (exempting only "noncompensated, nonreimbursed volunteer personal services") *with id.* § 23-15-801(e)(ii) (exempting all volunteer services).

registering the domain and setting up her website, as well as the time it took for her to build the website's framework (billed at her normal hourly rate) had caused her to exceed the $200 threshold. ROA.636-37. Ms. Breland and two of her friends then registered as a political committee called "Parents Against Personhood." ROA.638-39, .1563. Though they had not intended to start a political committee, ROA.630-31, Mississippi's campaign finance laws forced them to change their plans because "if you're forced by the State of Mississippi to have that framework and to do all of the reporting, you might as well be able to get some benefit out of it." ROA.639.

Parents Against Personhood elected not to make money from of certain financial transactions because they did not know how to characterize them on their reports. ROA.645. The "receipt keeping" necessary to comply with the reporting requirements was "definitely hard to manage, internally." ROA.643. The required reports took several hours to complete because Ms. Breland had to review financial records. ROA.647. Even though the law didn't require reporting of contributors until $200, Ms. Breland had to track every donation in case a donor gave $25 in one month and later gave enough to cross the threshold, creating more record-keeping requirements. ROA.640. Furthermore, she suffered from ongoing concern that she was making mistakes and about the consequences of those mistakes. ROA.647.

Disclosure also caused some donors to limit their contributions.  The State recommended that Ms. Breland not disclose information about contributors who gave less than $200 due to privacy concerns.  ROA.639-40.  She advised potential donors concerned about the disclosure of their identity to give $1 less than the reporting threshold.  ROA.648.  Ultimately, she received several donations of exactly $199—$1 less than the reporting threshold.  ROA.649.

### 2.     No 2011 Committee Complied With the Requirements

Plaintiffs further submitted evidence from the State's own campaign finance database demonstrating that no constitutional amendment ballot measure political committee that filed reports in 2011 did so without making errors.  *See* ROA.1882-83.[6]

### D.     Expert Evidence And Published Research

Plaintiffs also submitted the expert report of David Primo, Ph.D.  As discussed more fully below, Dr. Primo concluded that disclosure laws "provide virtually no informational benefits to voters and create disincentives to speak during ballot measure campaigns."  ROA.665.  Dr. Primo's conclusions are based

---

[6] The State moved to strike a summary of this evidence, ROA.1218, and argued the court should not consider the underlying documents from the database, ROA.1849 (the documents are at ROA.1514-1834).  The district court denied the motion to strike as moot because the court did not need to rely on it and did not rely on any of these materials.  ROA.2322.  Nevertheless, these documents were filed in the district court and, under Fed. R. App. P. 10(a), they are part of the record on appeal in this Court.  *Trevino v. Celanese Corp.*, 701 F.2d 397, 406 n.14 (5th Cir. 1983).

on peer-reviewed and published empirical research about the effects of disclosure laws.  David M. Primo, *Information at the Margin: Campaign Finance Disclosure Laws, Ballot Issues, and Voter Knowledge*, 12 Election L.J. 114 (2013); Dick Carpenter and Jeffrey Milyo, *The Public's Right to Know Versus Compelled Speech: What Does Social Science Research Tell Us About the Benefits and Costs of Campaign Finance Disclosure in Non-Candidate Elections?*, 40 Fordham Urb. L.J. 603 (2012).[7]

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*, construing all facts and evidence in the light most favorable to the non-moving party.  *See EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009).  This Court may affirm the district court's grant of summary judgment on any ground supported by the record and presented to the district court.  *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008).

---

[7] The State moved to exclude Dr. Primo's evidence, ROA.1042.  The district court denied the motion moot because the court did not need to rely on it.  ROA.2322.  Dr. Primo's report and materials were filed in the district court and, under Fed. R. App. P. 10(a), they are part of the record on appeal in this Court.  *Trevino*, 701 F.2d at 406 n.14.  Regardless, the underlying published social science about the lack of benefits and First Amendment burdens of disclosure laws may be considered by this Court, whether or not it was submitted to or considered by the district court.  *Dunagin v. Oxford*, 718 F.2d 738, 748 n.8 (5th Cir. 1983) (en banc) (plurality).

## SUMMARY OF ARGUMENT

The ordinary course of a First Amendment case is to determine first what level of scrutiny should apply, then determine whether the government interest is sufficiently weighty to carry its burden, and finally test the tailoring of the challenged law to the interest.  This case raises several potential issues of first impression in the Fifth Circuit as to both the level of scrutiny and sufficiency of the government interest.  But this Court can affirm the district court's judgment without necessarily taking on all of these issues of first impression.  *See, e.g.*, *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 538 (5th Cir. 2013) (because judgment would be the same under either strict or exacting scrutiny, "we do not need to announce the appropriate test").  Accordingly, in Part I, Plaintiffs first address affirmance of the district court on the narrowest grounds possible.  In Part II, Plaintiffs then turn to larger questions about the proper application of strict scrutiny and rejection of the informational interest.

As set forth in Part I, even assuming that strict scrutiny does not apply and that the informational interest does, the district court's determination that Mississippi's formation, registration, record-keeping, and reporting requirements are unconstitutional as applied to small groups speaking about ballot measures is not only correct, it is consistent with the determination of every other federal court to have ever considered a similar case.  The district court first properly found that

Plaintiffs, a small group speaking about ballot measures, brought an as-applied claim. The court then properly rejected "wholly without rationality review" as inconsistent with governing law and applied exacting scrutiny to Plaintiffs' claims. The district court then properly found that that State's minimal informational interest in the finances of small groups and individuals cannot justify the weighty burdens the State imposes on those same groups and individuals.

Given the district court's conclusion, this Court need not address the district court's rejection of strict scrutiny or acceptance of the informational interest in order to affirm. But, as explained in Part II, if this Court chooses to address those issues as part of its *de novo* review and ability to affirm on other grounds, this Court should apply greater constitutional scrutiny and less credulity to the State's claims than did the district court. First, this Court should hold that strict scrutiny should have been applied to Mississippi's "PAC-burden" laws, consistent with *Citizens United v. FEC*, 558 U.S. 310 (2010). Second, this Court should hold that the informational interest is not compelling or important in the context of speech about ballot issues and was not proven by the State to be furthered by its scheme.

**ARGUMENT**

**I.    The district court's conclusion that Mississippi's campaign finance scheme is unconstitutional as applied to small groups and individuals like Plaintiffs is amply supported by the record and precedent.**

The district court's conclusion that Mississippi's campaign finance scheme failed exacting scrutiny as applied to small groups and individuals speaking about ballot measures is consistent with holdings from the Seventh, Eighth, Ninth, and Tenth Circuits. No court has held that laws like Mississippi's are constitutional as applied to small groups speaking about ballot measures. As explained in Section A, the district court was correct to conclude that Plaintiffs had standing to bring an as-applied challenge. Further, as explained in Section B, the district court was correct to reject the "wholly without rationality" standard of review. Finally, as explained in Section C, the district court was correct to conclude that Mississippi's regulatory scheme cannot survive exacting scrutiny as applied to grassroots ballot measure speakers.

**A.    The district court correctly held that Plaintiffs have standing to raise their as-applied challenge; *Worley* is inconsistent with Fifth Circuit law.**

Plaintiffs brought a pre-enforcement challenge seeking to have Mississippi's campaign finance laws declared unconstitutional, both facially—no ballot measure group should be subject to these laws—and as applied to them as a small group. ROA.34. They had standing to bring all these claims.

### 1. The district court properly found that Plaintiffs were sufficiently exact in describing their activities to establish standing.

The State argues that Plaintiffs' as-applied challenge must fail because they did not state a maximum amount they would have spent in pursuit of their political activity, relying entirely on the Eleventh Circuit's decision in *Worley v. Cruz-Bustillo*, 717 F.3d 1238 (11th Cir. 2013). State Br. 46 & n.21.[8] Indeed, the State argues that a remand would be inappropriate because "there would be no facts to determine" as Plaintiffs never violated the law in the first place. *Id*. But the Plaintiffs are not required to violate the law to have standing, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("it is not necessary that [a party] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"), and they more than sufficiently proved that they are entitled to as-applied relief, *see Citizens United*, 558 U.S. at 331 (distinction between facial and as-applied challenges is not well defined, it "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint").

---

[8] The State also argues that Plaintiffs lack standing because they never attempted to complete the requisite forms, relying entirely on a case that was vacated, *Many Cultures, One Message v. Clements*, 830 F. Supp. 2d 1111 (W.D. Wash. 2011), *aff'd in part, vacated*, No. 11-36008, 520 F. App'x 517 (9th Cir. 2013). State Br. 50. A vacated decision has no precedential authority whatsoever. *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001).

The district court determined that Plaintiffs have "sufficiently shown more than 'subjective chill' and therefore have standing" in their pre-enforcement, as-applied challenge. ROA.2300. Plaintiffs set forth with specificity the myriad ways in which they are a small, informal, ad hoc group of friends and neighbors who engage in political speech in their spare time and fund their speech by literally "passing the hat." ROA.17-18, .25. Plaintiffs set forth precisely the political activity they wished to engage in—purchasing posters, flyers, and a quarter-page advertisement in their local paper—and explained how Mississippi's scheme limited that political activity. ROA.24-27. This satisfies the standing requirement. *Hous. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007) ("Chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.").

That Plaintiffs did not know precisely how much they would have spent is not fatal to their as-applied challenge. Requiring them to precisely determine how many posters, flyers, or advertisements they would buy months in advance is an artificial exercise that fails to reflect the nature of political speech, where "[t]he decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others." *Citizens United*, 558 U.S. at 334. Indeed, fundraising by "passing the hat" prevents such precise planning. But this serves to highlight that Plaintiffs are a small group that is categorically different than the sort

of large, sophisticated, moneyed interests invoked to defend campaign finance laws.

### 2.    *Worley* does not apply here and is contrary to Fifth Circuit law.

The State relies upon the Eleventh Circuit's decision in *Worley* to argue that Plaintiffs' as-applied challenge must fail because they "present[ed] a set of hypothetical facts based on speculation about future fundraising." State Br. 43. But Plaintiffs' facts are not speculative. The district court determined, based on record evidence, that Plaintiffs are a small group that was chilled from speaking because of Mississippi's campaign finance scheme. ROA.2300. Moreover, even if *Worley* were applicable here, this Court should reject *Worley* as inconsistent with this Court's case law and also with the First Amendment.

The *Worley* court ruled that the speculative possibility that a small group could become a big group precluded an as-applied challenge. At oral argument, responding to a hypothetical question, the group's counsel said "'if someone gave them a million dollars, they would be happy to spend that.'" 717 F.3d at 1242 n.2, 1251. Based on this, the *Worley* court determined that *in the future* (the 2010 election having passed) there was no guarantee the Worley group would *still* be small. *Id.* at 1242 n.2. But that hypothetical had no basis in the record; there was no evidence suggesting that those plaintiffs would ever face a situation involving such a benefactor. Plaintiffs may not engage in purely hypothetical scenarios to

gain standing, *see Houston Chronicle*, 488 F.3d at 619 ("subjective chill" not

sufficient for standing), but neither are they required to disprove fantastical

hypotheticals to have as-applied standing.

Courts in as-applied challenges like Plaintiffs' have expressly *not* required

the kind of speculative limit on activity that the State wants. In *Sampson v.*

*Buescher*, the Tenth Circuit was presented with a group that had spoken and been

punished. 625 F.3d 1247, 1251 (10th Cir. 2010). But in granting as-applied relief,

the court did not limit relief to what plaintiffs had previously spent. Rather, the

court refused to

> draw a bright line below which a ballot-issue committee cannot be
> required to report contributions and expenditures. The case before us
> is quite unlike ones involving the expenditure of tens of millions of
> dollars on ballot issues presenting 'complex policy proposals.' We
> say only that Plaintiffs' contributions and expenditures are well below
> the line.

*Id.* at 1261. And in *Hatchett v. Barland*, where it was not clear how much the

plaintiff would ultimately spend, the court found a $750 threshold was "well below

the line" where burdens like Mississippi's could be constitutionally applied. 816

F. Supp. 2d 583, 594-95, 606 (E.D. Wis. 2011).

Regardless, in *Worley* the plaintiffs had not accepted and spent $1 million

during the election that had triggered their suit. In the Fifth Circuit, this would

have been dispositive, and the *Worley* plaintiffs would have been allowed to

continue their pursuit of as-applied relief because there would be other small

groups in the future. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) ("even if it were doubtful that the [plaintiff] would again attempt to engage in election-related speech in Louisiana, precedent suggests that this case is not moot, because other individuals certainly will be affected by the continuing existence of the [campaign finance laws]").

*    *    *

There are no facts calling into question the fact that Plaintiffs' case "is quite unlike ones involving the expenditure of tens of millions of dollars." *Sampson*, 625 F.3d at 1261. Plaintiffs are undoubtedly a small group that limited their speech because of Mississippi's laws. Whatever the precise figure Plaintiffs would have spent, it was "well below the line," *id.*; *Hatchett*, 816 F. Supp. 2d at 606, where Mississippi's informational interest could be sufficiently important to justify the burdens of its scheme, as the district court determined. ROA.2323 ("[T]he $200 threshold is simply too low for the substantial burdens that the statute imposes on groups and individuals. Thus, as applied to Plaintiffs, the State's group registration and individual reporting requirements are unconstitutional."). This Court should reject the Eleventh Circuit's decision in *Worley* and hold that Plaintiffs may pursue their as-applied claims.

**B.    The district court correctly rejected "wholly without rationality" review.**

The district court correctly rejected the State's argument that Plaintiffs' claims were subject only to "wholly without rationality review."  ROA.2310.  In urging application of the "wholly without rationality" standard to Plaintiffs' claims, the State asks this Court to preclude as-applied challenges to registration, record-keeping, and reporting schemes by small groups and individuals.  The State's position is that Plaintiffs' challenge to its registration, reporting, and mandatory disclosure scheme is subject to exacting scrutiny, not strict scrutiny, because this is a "disclosure" case.  State Br. 26.  It defends its scheme against Plaintiffs' facial challenge by reference to the informational interest as elucidated in cases involving big-money campaigns.  *Id.* at 30-32.  But when Plaintiffs respond that they are not a big-money campaign, that they are small and, as applied to small groups, the governmental interest is demonstrably lessened, *see* Part I.C.3, *infra*., the State in turn insists that exacting scrutiny no longer applies because this has become a "threshold" case.  State Br. 33.  The logic of the State's argument is that it is impossible for a small group to bring an as-applied exacting-scrutiny challenge to "disclosure" laws—they only get "wholly without rationality" review.

Applying wholly without rationality to a challenge to disclosure laws is contrary to this Court's prior decisions and every recent Supreme Court case on point.  At a minimum, this court has said exacting scrutiny applies to "disclosure"

29

laws. *Asgeirsson v. Abbott*, 696 F.3d 454, 463 (5th Cir. 2012).[9]  Moreover, every

recent Supreme Court case has required a form of elevated scrutiny in order to

protect vital First Amendment rights.  *E.g.*, *Citizens United*, 558 U.S. at 340, 366

(applying strict and exacting scrutiny); *Davis v. FEC*, 554 U.S. 724, 744 (2008)

(applying exacting scrutiny); *Buckley v. Am. Const. Law Found.*, 525 U.S. 182,

202 (1999) ("'exacting scrutiny' is necessary when compelled disclosure of

campaign-related payments is at issue") (citing *Buckley v. Valeo*, 424 U.S. 1, 64-65

(1976)).

       No court to have considered a case like the Plaintiffs' has applied the

standard the State urges.  *E.g.*, *Sampson*, 625 F.3d at 1255 (applying exacting

scrutiny in an as-applied case); *see also Minn. Citizens Concerned for Life, Inc. v.

Swanson*, 692 F.3d 864, 876 (8th Cir. 2012) (en banc) (holding a Minnesota law

that triggered ongoing reporting requirements upon a $100 aggregate expenditure

unconstitutional under exacting scrutiny); *cf. id.* at 884 (dissenting judges applying

wholly without rationality to $100 threshold).  The cases the State relies on—the

*McKee* cases from the First Circuit and the *Family PAC v. McKenna* case from the

Ninth Circuit, State Br. 34—involved challenges to thresholds on reporting of

individual contributors to groups that were already organized.  As the *Family PAC*

---

[9] For the reasons set forth in Part II.A, *infra*, Plaintiffs here should receive strict
scrutiny.

decision recognized, such challenges are not the same as Plaintiffs' challenge here. 685 F.3d 800, 810 n.10 (9th Cir. 2012). To the contrary, *Family PAC* expressly reaffirmed that *Sampson*, which applied exacting scrutiny, was the proper case to apply when a group challenges formation, registration, record-keeping, and reporting requirements like Plaintiffs have. *Id.*

Applying the wholly without rationality standard would turn Plaintiffs' challenge to laws that chill core political speech and association into a mere rational basis case—a turn of events that the Supreme Court would not countenance. The Eighth Circuit has already criticized the elevation of "labels" over content in First Amendment cases because "[a]llowing states to sidestep strict scrutiny by simply placing a 'disclosure' label on laws imposing the substantial and ongoing burdens typically reserved for PACs risks transforming First Amendment jurisprudence into a legislative labeling exercise." *Swanson*, 692 F.3d at 875 (collecting cases). Allowing states to sidestep even exacting scrutiny by labeling a challenge from a small group of friends and neighbors a "threshold" issue certainly does the same.

This Court should not be the first to adopt wholly without rationality review for claims like Plaintiffs'. To do so would preclude as-applied challenges to registration, reporting, and mandatory disclosure schemes by small groups and individuals—the very groups the government has the least interest in regulating

and upon whom those regulations weigh heaviest.  *See* Part I.C.3, *infra*.  At a

minimum, Plaintiffs are entitled to "exacting scrutiny" for their as-applied claims.

### C.   The district court correctly held that the burdens Mississippi imposes on small ballot measure groups and individuals cannot withstand exacting scrutiny.

As explained in Part II, Mississippi's registration, record-keeping, and

reporting requirements should be subjected to strict scrutiny, and this Court should

not accept the State's alleged informational interest here.  Nevertheless, even if this

Court assumes that exacting scrutiny applies to Mississippi's laws *and* that the

informational interest is generally important in ballot measure elections, this Court

should affirm.  This is because, as explained in Section 2, Mississippi's scheme

imposes substantial burdens on protected speech and association, especially on

small groups and individuals like Plaintiffs.  As explained in Section 3, the

informational interest is at a "low ebb" when small groups spending small amounts

of money on ballot measure speech are at issue, and courts protect such groups

from burdens like Mississippi's.

### 1.   Exacting Scrutiny

The district court held that Plaintiffs' claims were subject to exacting

scrutiny.  ROA.2302.  This Court has held that "disclosure" laws are subject to

exacting scrutiny.  *Asgeirsson*, 696 F.3d at 463; *Chamber of Commerce of the U.S.*

*v. Moore*, 288 F.3d 187, 192 (5th Cir. 2002).  Under exacting scrutiny, the

government bears the burden of demonstrating that a disclosure law is substantially related to a sufficiently important government interest, which requires the government to show that "the strength of the governmental interest . . . reflect[s] the seriousness of the actual burden on First Amendment rights." *Doe v. Reed*, 130 S. Ct. 2811, 2818-19 (2010) (internal citations and quotation marks omitted). "Though possibly less rigorous than strict scrutiny, . . . exacting scrutiny is more than a rubber stamp," and "[t]he Supreme Court has not hesitated to hold laws unconstitutional under this standard." *Swanson*, 692 F.3d at 876 (collecting cases).

> 2.    **The burdens of Mississippi's scheme are substantial and fall heaviest on small groups like Plaintiffs.**

The burdens Mississippi has placed on protected political speech and association fall generally under two headings, "red-tape burdens" and "fear of disclosure." These burdens are clear on the face of Mississippi's statutes, proven in discovery, discussed in published literature, and precisely those that other courts have found unconstitutional, especially when applied to small groups and individuals.

> a.    **Red-Tape Burdens**

Mississippi's laws force speakers to adopt formal structures, register with the government, comply with record-keeping and reporting requirements, and navigate complex statutory schemes the likes of which flummox even lawyers and

judges.  These "red-tape burdens" chill the exercise of political speech and association rights.

As the Supreme Court recognized in *Citizens United*, political committees "are expensive to administer and subject to extensive regulations."  558 U.S. at 337.  Mississippi's regulations are almost identical to those found burdensome for multi-million dollar corporations in *Citizens United*.  Both schemes require committees to "appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making donations, . . . and file an organization statement and report changes to this information within 10 days." *Citizens United*, 558 U.S. at 338; Miss. Code Ann. §§ 23-15-803(a)&(b), 23-17-49(1)&(2).  "And that is just the beginning," because Mississippi political committees, like federal PACs, must provide extensive, ongoing reporting of their activity.  *Citizens United*, 558 U.S. at 338; Case Statement § II.B.2-5, *supra.*

In Mississippi, these burdens are triggered if Plaintiffs pool more than just $200 of their own money.  Miss. Code Ann. §§ 23-15-801(c), 23-17-47(c), 23-17-49(1).  Indeed, if any Plaintiff spent more than $200 of his or her own money, Mississippi law also applies on-going record-keeping, reporting, and disclosure obligations as a part of the same scheme.  *Id.* § 23-17-53(a)&(c).  Speakers must therefore "assume a more sophisticated organizational form," *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255 (1986) ("*MCFL*") (plurality opinion), by

designating a director and a treasurer who is legally responsible to keep the books and accounts, and by reporting their activities to the State using very particular accounting, Miss. Code Ann. §§ 23-15-803, 23-15-807(b)&(d), 23-17-49, 23-17-51, 23-17-53. All this speakers must do timely and correctly, under threat of fines and imprisonment. *Id.* §§ 23-15-811(a), 23-15-813(a), 23-17-51(4), 23-17-61. Status as a regulated political committee or individual thus carries significant consequences for the unwary or unsophisticated, especially when a speaker may not even be aware she is regulated. "Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports . . . it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it." *MCFL*, 479 U.S. at 255.

"[T]hese regulatory burdens—or even just the daunting task of deciphering what is required under the law," mean that small groups and individuals "reasonably could decide the exercise is simply not worth the trouble. And who would blame them?" *Swanson*, 692 F.3d at 873-74 (internal citations omitted). These laws force speakers "to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message." *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008). The complexity of Mississippi's scheme is clear on the face of the statutes and

illustrated by the record. Case Statement § II.B-D, *supra*. A Mississippian may find herself in violation of campaign finance laws without having spent a single dollar. *See* ROA.635-36. Ms. Breland testified that the State's "simple" monthly report took her "hours" to complete, and she still suffered from ongoing concern that she was making mistakes and about the consequences of those mistakes. ROA.647.[10] This is not surprising; it has been demonstrated that people struggle, and fail, to complete campaign finance forms correctly even for very small groups. Carpenter and Milyo, *The Public's Right to Know Versus Compelled Speech*, 40 Fordham Urb. L.J. at 626-28.

Exacerbating this confusion is the fact that Mississippi has two separate sets of statutes that, based on their plain language, apply to constitutional amendment ballot measure committees. Case Statement § II.B.1, *supra*. As Plaintiffs explained, they would have to spend a great deal of time reviewing the campaign finance laws in order to try to comply with them, particularly because they would have to "wade through" multiple sets of statutes to determine all the relevant obligations. ROA.25. Although the State now claims that only one of these sets is enforced against constitutional amendment ballot measure committees, it reached that conclusion only through close lawyerly parsing of the relevant language. State

---

[10] The State's own database demonstrates that filling out the forms is difficult. *See* Case Statement § II.C.2 & n.6, *supra*.

Br. 52-53; *Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 528-29 (1947) (resorting to titles "of use only when they shed light on some ambiguous word or phrase"); *see also* ROA.598-99 ("to the extent that a section . . . pertains to [a] more specific subject as opposed to [a] more general subject, the specific section takes precedent over a more general section.").  Moreover, the State's litigation position is in direct conflict with its official campaign finance guidance documents and forms, meaning the State is misleading would-be Mississippi speakers.  Case Statement § II.B.6, *supra*.  This demonstrates not just how difficult it is to understand the laws, but also the threat of potentially arbitrary enforcement of the laws.  ROA.2314 ("even if a potential advocate follows the state's own instructions, he or she might nonetheless be fearful of a failure to comport"); *Swanson*, 692 F.3d at 873 n.8 (cannot "expect potentially regulated associations to rely on [the state's] informal assurance that it would not enforce the plain meaning of the statute").[11]

Ultimately, as the district court determined, it does not matter whether Chapter 15, Chapter 17, or both apply to Plaintiffs' speech.  ROA.2315 n.6.  That the statutes require such lawyerly parsing in the first place effects an unconstitutional chilling of speech:  "The First Amendment does not permit laws

---

[11] For this same reason, Plaintiffs cannot be faulted for not seeking informal or formal guidance from the Secretary of State as to which statutes apply to their speech and for help with filling out the forms. *Cf.* State Br. 51.

that force speakers to retain a campaign finance attorney . . . or seek declaratory rulings before discussing the most salient political issues of our day." *Citizens United*, 558 U.S. at 324. That the parties have to engage in this debate demonstrates the burdensome complexity of Mississippi's scheme.[12] Moreover, the red-tape burdens of either chapter, standing alone, are precisely those recognized as substantial in cases like *Citizens United*, 558 U.S. at 337-38, *Swanson*, 692 F.3d at 873, and *Sampson*, 625 F.3d 1259-60, which lead speakers to decide that "contemplated political activity [is] simply not worth it." *MCFL*, 479 U.S. at 255.

### b.     Fear of Disclosure

The detailed reports further chill political speech and association through the disclosure of personal information. Every committee must disclose the name and address of every individual officer. Miss. Code Ann. § 23-17-49(2)(a). An individual who spends more than $200 of her own money must also provide her

---

[12] The State and its *amicus* contend that any ambiguity in the applicability of the chapters ought to result in *Pullman* abstention. State Br. 52-53 n.24; Br. *Amicus Curiae* for Campaign Legal Center 5 n.3. The district court correctly rejected this argument. ROA.2316 n.5. Plaintiffs argue that the statutory scheme is convoluted and therefore has a chilling effect upon the exercise of constitutionally protected speech and association. The argument that *Pullman* abstention is necessary is an implicit admission that the statutory scheme is convoluted. Moreover, abstention is particularly inappropriate in First Amendment cases because it would "'effect the impermissible chilling of the very constitutional right [the plaintiff] seeks to protect.'" *City of Hous. v. Hill*, 482 U.S. 451, 467 (1987) (quoting *Zwickler v. Koota*, 389 U.S. 241, 252 (1967)).

name, address, and telephone number. *Id*. § 23-17-53(a). Both committees and individuals must also disclose the name and street address of each person who has contributed more than $200. *Id*. §§ 23-15-807, 23-17-53. Further, the forms mandated by the Secretary of State require the disclosure of a $200 contributor's employer and occupation. ROA.588.

The "deterrent effect" that compelled disclosure has on the free exercise of the "constitutionally protected right of association" has long been recognized. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958). One study has shown that disclosure of their name and address would lead about 60 percent of the study participants to "think twice about contributing" to a ballot measure campaign. Carpenter and Milyo, *The Public's Right to Know Versus Compelled Speech*, 40 Fordham Urb. L.J. at 623-25 (summarizing study findings effects of disclosure). Real-world experience in Mississippi bolsters these observations. Several contributors to Atlee Breland's constitutional amendment ballot measure committee gave exactly $199 because it was the most that they could give while maintaining their anonymity. ROA.648-49. Even the State recognizes the threat of disclosure: The Secretary of State's office specifically instructed Ms. Breland not to disclose information about sub-$200 contributors in order to protect their privacy. ROA.639-40.

### 3.     The State's interest is at a "low ebb" here.

Mississippi can rely on just the "informational interest" to support its burdensome scheme because this is a case about ballot measure speech.  State Br. 28 & n.12; *see also First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 790 (1978) ("[t]he risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue").  Because the State is limited to the informational interest, its scheme "rests on different and less powerful state interests" than supported "disclosure" in *Buckley v. Valeo* and many other cases.  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356 (1995).  As explained in Section a, the informational interest does not apply with any force to small groups and individuals.  As explained in Section b, every federal court to have considered a challenge to laws like Mississippi's by a group like Plaintiffs' has held the laws to be unconstitutional.  As explained in Section c, the cases that the State relies on did not consider a challenge by a small group like Plaintiffs.

### a.     The informational interest does not apply with any force to small groups and individuals.

This Court has previously stated in dicta, in a case about limits on contributions to ballot measure groups, that "promoting disclosure of campaign contributors is an important state interest."  *Let's Help Fla. v. McCrary*, 621 F.2d 195, 200 (5th Cir. 1980); *but see McIntyre*, 514 U.S. at 348-49 (the "simple interest in providing voters with additional relevant information" was "plainly insufficient

to support the constitutionality" of a disclaimer requirement that applied to speech about ballot issues). Other circuit courts have also said that disclosure in ballot measure elections is important. *E.g.*, *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 477 (7th Cir. 2012); *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1032 (9th Cir. 2009).

Nevertheless, courts have made the "common-sense" observation that the value of campaign finance disclosure "declines drastically as the value of the expenditure or contribution sinks to a negligible level." *Canyon Ferry*, 556 F.3d at 1033. These laws are only "designed to inform the public what groups have demonstrated an interest in the passage or defeat of a candidate or ballot issue by their *contributions* or *expenditures* directed to that result." *Id.* at 1032-33. Thus, these schemes result only in information about the identity of people or groups "*financially* supporting or opposing a candidate or ballot proposition," not about "what groups may [generally] be in favor of, or opposed to, a particular candidate or ballot issue." *Id.* This means that such laws "reveal only one dimension of the support for a ballot measure." *Sampson*, 625 F.3d at 1259.

The limited nature of the informational interest "must be kept in mind when evaluating the constitutionality of a particular financial-disclosure requirement," *id.*, because the limitations greatly affect whether a particular scheme is "substantially related to that interest." *Canyon Ferry*, 556 F.3d at 1033. "As a

matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level." *Id.* Voters can learn "little about the *financial* backing of the ballot proposition by gaining access to information about" such small activities and groups. *Id.* at 1033-34. "Meanwhile, the burden of reporting remains constant even though the size of the in-kind expenditure decreases to a negligible level." *Id.* at 1034.

### b.      Similar cases in other circuits all favor Plaintiffs.

The "common sense" reasoning of the *Canyon Ferry* decision is now widely adopted in the federal courts. Indeed every federal court to have considered small ballot measure group formation, registration, record-keeping, and reporting requirements has found them unconstitutional. This Court has never before considered such a case.

The Tenth Circuit found Colorado's registration, reporting, and mandatory disclosure requirements unconstitutional as applied to a group of neighbors who had spent $782.02 for signs, a banner, postcards, and postage in their efforts to oppose the annexation of their neighborhood into a neighboring town. *Sampson*, 625 F.3d at 1251, 1254. The Tenth Circuit recognized that a case in which a group had spent "less than $1,000 on a campaign" was "quite unlike ones involving the expenditure of tens of millions of dollars on ballot issues." *Id.* at 1261.

The Eighth Circuit, sitting en banc, recognized that campaign finance laws "manifestly discourage[] associations, particularly small associations with limited resources, from engaging in protected political speech." *Swanson*, 692 F.3d at 874, 876. Accordingly, Minnesota's "independent expenditure law almost certainly fail[ed] [exacting scrutiny] because its ongoing reporting requirement—which is initiated upon a $100 aggregate expenditure, and is untethered from continued speech—does not match any sufficiently important disclosure interest." *Id.* at 876.

The Ninth Circuit in *Canyon Ferry* held that the application of campaign finance laws to a church that engaged in de minimis political activities was a violation of the First Amendment. 556 F.3d at 1034. And the Ninth Circuit has recently reaffirmed that claims like Plaintiffs' are to be governed by *Sampson* and *Canyon Ferry*. *Family PAC*, 685 F.3d at 810 n.10.

The Seventh Circuit also recognized that the informational interest cannot justify campaign finance laws when applied to small groups like Plaintiffs' even if it did justify regulations on large groups. This is because "the state's interest in disseminating such information to voters is at a low ebb" in cases involving small groups. *Madigan*, 697 F.3d at 482 (citing *McIntyre*, 514 U.S. at 348-49, and *Sampson*, 625 F.3d 1247).

Similarly, two district court cases in the Seventh Circuit found unconstitutional two versions of Wisconsin's formation, registration, record-

keeping, and reporting requirements as applied to small groups.  In *Swaffer v. Cane*, the court found the requirements unconstitutional as applied to a plaintiff who estimated he would spend $500, which was in excess of Wisconsin's threshold.  610 F. Supp. 2d 962, 964-65, 970 (E.D. Wis. 2009).  And in *Hatchett v. Barland*, the court found the same statutes unconstitutional again after the threshold was raised to $750, even though it was not clear how much the Plaintiff was going to spend.  816 F. Supp. 2d at 605-06 ("Even if Hatchett spends $1,000 on the next referendum, his expenditure would be sufficiently small which in turn would provide little information about his financial interest on a given issue.").

### c. The cases relied on by the State are not small ballot measure group cases.

The State does not address these cases that are directly on point.  All but one of the cases the State relies on to argue its "important" interest, State Br. 26-33, have involved larger groups and have not addressed the lesser benefits and greater burdens of campaign finance laws when those schemes are applied to smaller groups.  *E.g.*, *Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34, 38 (1st Cir. 2012); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 40 (1st Cir. 2011); *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 994-995 (9th Cir. 2010); *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1091 (9th Cir. 2003).  In *Worley*, the only case involving a small group relied on by the State, the Eleventh Circuit expressly refused to consider the scheme as applied to a small group. 717 F.3d at

1242 n.2.  As *Worley* expressly states, it did not "reach the question of whether the statute is constitutional as applied to four individuals raising only $600."  *Worley*, 717 F.3d at 1252.

*    *    *

Ultimately, the strength of Mississippi's interest in information about speakers like the Plaintiffs does not reflect the seriousness of the heavy burdens that Mississippi places on Plaintiffs' First Amendment rights.  Every other federal court to have considered the application of a scheme like Mississippi's to a group like Plaintiffs' has determined the scheme to be unconstitutional.  They have done this based on the common sense recognition that even if the informational interest is generally "important," it is not important enough to justify burdens like Mississippi's when applied to small groups speaking about ballot measures.  For the same reason, this Court should join its sister circuits and affirm the decision of the district court.

**II.    This Court should affirm by holding that the district court should have applied strict scrutiny and rejected the informational interest.**

Although this Court can hold for Plaintiffs as described above, this Court can and should determine that the district court erred in being too deferential to the State.  First, as explained in Section A, the district court should have applied strict scrutiny, rather than exacting scrutiny, to Mississippi's scheme.  Second, as explained in Section B, the district court should have rejected the State's claimed

informational interest because it is not compelling or important in the context of speech about ballot measures. Third, as explained in Section C, the State failed to prove its informational interest is furthered by its regulatory scheme when applied to ballot measure speech.

### A.    This Court should apply strict scrutiny to Mississippi's PAC burdens, as required by *Citizens United*.

As explained in Section 1 below, binding Supreme Court precedent holds that laws like Mississippi's formation, registration, and reporting requirements are subject to strict scrutiny. Further, as explained in Section 2, these requirements are not mere "disclosure" laws, and, as explained in Section 3, the grounds on which the State and the district court attempted to distinguish *Citizens United*'s holding are unpersuasive.

### 1.    *Citizens United* requires application of strict scrutiny.

This Court should apply strict scrutiny to Mississippi's "PAC burdens" because the Supreme Court held in *Citizens United* that laws that prohibited speakers from speaking collectively unless they did so through a political committee were subject to strict scrutiny. 558 U.S. at 340. *Citizens United* considered the constitutionality of a federal campaign finance law that prohibited corporations and unions from speaking in candidate elections unless they did so through a PAC. *Id.* at 320-21. The Court found that the law functioned as a "ban on speech" notwithstanding the option for corporations and unions to establish and

speak through a PAC.  *Id.* at 339.  This was because "PACs are burdensome
alternatives" that are "expensive to administer and subject to extensive
regulations" because of the formal formation, registration, record-keeping, and
reporting requirements.  *Id.* at 337-38.[13]  Accordingly, the Supreme Court
subjected those burdens to strict scrutiny, required the government "to prove that
the restriction furthers a compelling interest and is narrowly tailored to achieve that
interest," *id.* at 340 (internal quotation marks omitted), and held the federal
regulatory scheme unconstitutional because it was not tied to a threat of corruption,
*id.* at 365.

    The reasoning of *Citizens United* applies with even greater force here.  Just
as corporate directors, employees, and shareholders were prohibited from speaking
collectively unless they did so through a PAC in *Citizens United*, Plaintiffs here
cannot speak collectively unless they do so through a political committee.  Miss.
Code Ann. §§ 23-15-803(a), 23-17-49(1).  Under both Mississippi and federal law,
PACs must "appoint a treasurer, forward donations to the treasurer promptly, keep
detailed records of the identities of the persons making donations, . . . and file an

---

[13] Notably, the Court reached this conclusion despite the fact that Citizens United
itself had successfully operated a PAC with "millions of dollars in assets" "for over
a decade" before filing their challenge to federal PAC requirements.  *See Citizens
United*, 558 U.S. at 393, 419 & n.40 (Stevens, J., dissenting).  Nevertheless, the
Court held that those requirements were unconstitutionally burdensome.  *Id.* at
338-39.

organization statement and report changes to this information within 10 days."

*Citizens United*, 558 U.S. at 337-38; Miss. Code Ann. §§ 23-15-803, 23-17-49.

"And that is just the beginning," because Mississippi political committees, like

federal PACs, must provide extensive, ongoing reporting of their activity. *Citizens*

*United*, 558 U.S. at 338; Case Statement § II.B.2-5, *supra.*

### 2.    PAC burdens are not mere "disclosure" laws.

The State argues that its PAC burdens are not to be judged under strict

scrutiny because "disclosure" laws are not so judged. State Br. 26-27. The State

insists that this argument is supported by *Citizens United*, but the State has

conflated two distinct portions of *Citizens United*.

A portion of *Citizens United* does apply "exacting scrutiny" to a disclosure

requirement—the separate electioneering-communications disclosure requirement,

558 U.S. at 366-67 (discussing 2 U.S.C. § 434(f)), but this is not the portion of

*Citizens United* that judged PAC burdens. The en banc Eighth Circuit elaborated

on this distinction in *Swanson*, which concerned a Minnesota law that imposed

PAC requirements on associations that wished to speak in candidate elections:

> The effect of the [electioneering-communication disclosure] laws—
> requiring *one-time disclosure* only when a substantial amount of
> money was spent—matched the government's disclosure purpose. In
> contrast, the effect of Minnesota's ongoing reporting requirements,
> which are initiated upon $100 aggregate in expenditures, and are
> unrelated to future expenditures, does not match any particular
> disclosure interest. *Other requirements, such as requiring a treasurer,*

> *segregated funds, and record-keeping, are only tangentially related to disclosure.*

*Swanson*, 692 F.3d at 875 n.9 (emphasis added); *see also MCFL*, 479 U.S. at 262 (comparing one-time disclosure obligation with "the full panoply of regulations that accompany status as a [PAC]").  Given these material differences, the Eighth Circuit rightly observed that "[a]llowing states to sidestep strict scrutiny by simply placing a 'disclosure' label on laws imposing the substantial and ongoing burdens typically reserved for PACs risks transforming First Amendment jurisprudence into a legislative labeling exercise."  *Swanson*, 692 F.3d at 875.

This Court should reject Mississippi's attempt to "label" its way out of the appropriate level of scrutiny.  The application of "exacting scrutiny" leads to the absurd result that shareholders and corporate executives enjoy greater rights of association than others who—like Plaintiffs—choose to organize in a more informal manner.  This cannot be squared with the First Amendment.

### 3. *Citizens United*'s holding cannot be distinguished.

The district court in its decision below, ROA.2302, and the State in its opening brief, State Br. 26-28, tried to distinguish *Citizens United*'s holding on PAC burdens.  But these efforts simply cannot be squared with *Citizens United*'s plain language.  *Worley*, the central case in both the district court's rationale and the State's argument, unpersuasively attempted to ignore the PAC-burden holding

in *Citizens United* based on four factors.  In doing so, however, *Worley* directly

contradicted Supreme Court precedent.

First, *Worley* thought the Supreme Court's application of exacting scrutiny

to the electioneering-communication disclosure laws separately at issue in *Citizens*

*United* was "not so easily set aside."  717 F.3d at 1243.  But in rejecting strict

scrutiny for PAC burdens, *Worley* too easily set aside the distinction the Supreme

Court had been careful to draw.  *Worley* wrongly conflated the distinct discussions

of PAC burdens and disclosure laws in *Citizens United* and, in doing so, ignored

*Swanson*'s proper elucidation of the holding.

Second, *Worley* recognized that *Citizens United* "discussed PAC regulations

as 'burdensome alternatives'" but insisted that *Citizens United* did not hold "that

PAC regulations themselves constitute a ban on speech or that they should be

subject to strict scrutiny."  717 F.3d at 1244.  This is wrong.  *Citizens United*

clearly held that the PAC burdens themselves worked as a functional ban on

speech subject to strict scrutiny because "the option to form PACs *does not*

*alleviate* the First Amendment problems."  558 U.S. at 337 (emphasis added).

Indeed, the *Worley* court compounded its error by stating that "[i]n contrast

with the corporations in *Citizens United*, Challengers are free to speak themselves.

It is only when they wish to speak collectively to influence elections that the

Florida PAC regulations apply."  717 F.3d at 1244.  Even if this were true in

Florida, it is not true in Mississippi:  Individuals too must comply with ongoing

record-keeping and reporting requirements.  Miss. Code Ann. §§ 23-17-51(2)&(3),

23-17-53(a)&(c).  Moreover, *Worley* leads to the conclusion that individuals

speaking about ballot measures may be treated worse when they exercise their

right to associate in order to speak.  The Supreme Court has long "rejected the

argument that political speech of corporations *or other associations* should be

treated differently under the First Amendment simply because such associations

are not 'natural persons.'"  *Citizens United*, 558 U.S. at 343 (emphasis added)

(quoting *Bellotti*, 435 U.S. at 776).[14]

Third, *Worley* pointed to other circuit court decisions applying exacting

scrutiny.  717 F.3d at 1244.  The Fifth Circuit is not among them.  And while it is

true enough that these other decisions applied exacting scrutiny, aside from the

Eight Circuit in *Swanson*, none of these cases attempted to grapple with the

distinction between PAC burdens and mere disclosure requirements.

Finally, although *Worley* recognized the Eighth Circuit's en banc opinion in

*Swanson* calling into question the legal and logical soundness of applying exacting

---

[14] Notably, in *Citizens United*, the FEC had argued that it was "simply wrong" to
consider the federal prohibition on corporate spending a "ban" on speech because
"the individuals who own, fund, or manage a corporation remain free to engage in
their own advocacy no matter what restrictions are placed on the corporation."
Supp. Reply Br. for the Appellee at 6, *Citizens United v. FEC*, (2010) (No. 08-
205), *available at* http://www.scotusblog.com/wp-content/uploads/2009/08/FEC-
Citz-United-reply-brief-8-19-09.pdf.

scrutiny to PAC burdens, it noted that the Eighth Circuit ultimately applied exacting scrutiny.  717 F.3d at 1245.  But the reason was only because "even if exacting scrutiny is appropriate" the law at issue "fail[ed]."  *Swanson*, 692 F.3d at 875.  *Swanson* clearly did not hold that exacting scrutiny should apply.

In short, the Eleventh Circuit's decision in *Worley* is not a strong case to rely on.  Far more powerful is the plain language of the *Citizens United* decision.  Nothing in *Worley*, or any other case, overcomes the fact that the Supreme Court has ruled that PAC burdens (though not "disclosure laws" generally) are subject to strict scrutiny.

### B.    The informational interest does not justify disclosure in ballot measure speech.

The plaintiffs win under exacting scrutiny even if there is an informational interest.  Part I, *supra.*  The Plaintiffs also win under strict scrutiny.  There is a third reason why Plaintiffs win:  The only interest the State can claim supports its regulations here is the informational interest, and the informational interest will not support disclosure in ballot measure speech.  Accordingly, in the absence of any sufficient governmental interest, Plaintiffs win whether the Court applies strict or exacting scrutiny.

The informational interest is in "providing 'the electorate with information as to where political campaign money comes from' in order to educate and aid voters in evaluating the speech."  State Br. 28 (quoting *Buckley v. Valeo*, 424 U.S.

at 67-68).  But *Buckley*, from whence "disclosure jurisprudence" sprang, involved

the Federal Election Campaign Act of 1971, which "regulates only candidate

elections, not referenda or other issue-based ballot measures."  *McIntyre*, 514 U.S.

at 356.  This history is important because "disclosure" by candidate campaigns and

even by independent groups speaking about candidates ("independent

expenditures") can be linked to a concern about corruption in a way that disclosure

about ballot measures simply cannot.  *Id.*  As to ballot measure groups, however,

Mississippi's laws "rest[] on different and less powerful state interests" than

supported "disclosure" in *Buckley v. Valeo* and many other cases.  *Id.*

> ### 1.    The informational interest is neither compelling nor important in ballot measure elections.

Neither the Supreme Court nor this Court has ever held that the

informational interest is compelling.  In *Doe v. Reed*, the Supreme Court recently

declined the opportunity to accept the "informational interest" as even a

"sufficiently important" state interest, let alone a *compelling* one.  130 S. Ct. at

2818-19.  Not one of the seven separate opinions in *Doe* adopted the government's

asserted informational interest—all relied instead on the governmental interest in

detecting fraudulent petition signatures.

The Court's approach in *Doe v. Reed* is entirely consistent with the Supreme

Court's ruling in *McIntyre*, in which the Court held that the "simple interest in

providing voters with additional relevant information" was "plainly insufficient to

support the constitutionality" of a disclaimer requirement that applied to speech about ballot issues. 514 U.S. at 348-49. *McIntyre* is the only case in which the Supreme Court has squarely ruled on disclosure laws and the informational interest in ballot measure elections. The Supreme Court "has never upheld a disclosure provision for ballot-issue campaigns that has been presented to it for review." *Sampson*, 625 F.3d at 1258. Those Supreme Court cases actually addressing the informational interest have been specifically limited to candidates. *E.g.*, *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 92-93 (1982); *Buckley v. Valeo*, 424 U.S. at 67, 79-80. And although the Court has alluded to the utility of disclosure laws in the ballot issue context, it has done so only in dicta and only in cases in which it struck down laws that burdened speech about ballot issues. *See Buckley v. Am. Const. Law Found.*, 525 U.S. at 202-04; *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298-300 (1981); *Bellotti*, 435 U.S. at 791-92 & n.32; *see also McIntyre*, 514 U.S. at 353-54 (noting that discussion of disclosure in *Bellotti* was dicta).

Writing separately in *Doe v. Reed*, Justice Alito noted that the informational interest was both limitless and contrary to First Amendment values. As he said, "[t]he implications of accepting such an argument are breathtaking" and "paint[] a chilling picture of the role of government in our lives." 130 S. Ct. at 2824-25 (Alito, J., concurring). Accepting the "informational interest" would leave the

State "free to require [disclosure of] all kinds of demographic information, including . . . race, religion, political affiliation, sexual orientation, ethnic background, and interest-group memberships." *Id.* at 2824.  The Supreme Court is very wary of logically unbounded state interests in the campaign finance context. *Citizens United*, 558 U.S. at 359 ("Reliance on a generic favoritism or influence theory . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle." (internal quotation marks omitted, alteration in original)).  Furthermore, "[r]equiring such disclosures . . . runs headfirst into a half century of our case law, which firmly establishes that individuals have a right to privacy of belief and association." *Doe v. Reed*, 130 S. Ct. at 2824 (Alito, J., concurring) (collecting cases).[15]

> **2.    Fifth Circuit precedent since *McIntyre* is silent as to the informational interest in ballot measure elections.**

Since *McIntyre* established that the informational interest is "less powerful" in the context of ballot measure speech, this Court has not determined whether the informational interest is "important" as applied to such speech.  Previous to *McIntyre*, in a case about limits on contributions to ballot measure groups, this Court said in dicta that disclosure is an important state interest.  *McCrary*, 621 F.2d

---

[15] The Tenth Circuit has also expressed skepticism about the informational interest, noting that it is "not obvious that there is such a public interest," and that disclosure in ballot measure elections actually harms public discourse. *Sampson*, 625 F.3d at 1256, 1257.

at 200. But following *McIntyre*, this Court has recognized that anonymity in

speech is "'not a pernicious, fraudulent practice, but [rather] an honorable tradition

of advocacy and dissent,'" and that *McIntyre* strengthens the arguments against

disclosure. *Justice for All v. Faulkner*, 410 F.3d 760, 764 (5th Cir. 2005) (quoting

*McIntyre*, 514 U.S. at 357) (holding unconstitutional a rule that forced

pamphleteers on the University of Texas campus to disclose their identity to

recipients of their literature).

### 3. Those cases calling the informational interest in ballot measure elections "important" have ignored *McIntyre*.

The State posits two theories to argue that its informational interest is

particularly important in ballot measure elections. But these theories cannot be

squared with *McIntyre.*

The first theory is that speech in ballot measure elections is the equivalent to

"lobbying" and therefore important to regulate. State Br. 30 (citing *Madigan*, 697

F.3d at 480). But this argument was squarely rejected by the Supreme Court in

*McIntyre*. There, the Court noted that Ohio's disclosure provision was a regulation

of "pure speech" not akin to lobbying regulations at all: "The activities of

lobbyists who have direct access to elected representatives, if undisclosed, may

well present the appearance of corruption." 514 U.S. at 345, 356 & n.20

(distinguishing the case at bar from *United States v. Harris*, 347 U.S. 612 (1954)).

Because corruption is not possible in ballot measure elections, this "lobbying"

notion does not apply to speech about ballot measures. *Id.*

The second theory is that "ballot measures are often complex and 'being

able to evaluate who is doing the talking is of great importance' given the

generally short time in which voters focus on these complex initiatives." State Br.

31 (citing *Getman*, 328 F.3d at 1105 and *Family PAC*, 685 F.3d at 808). But

again, *McIntyre* rejected this paternalistic notion for restricting speech:

> Of course, the identity of the source is helpful in evaluating ideas.
> But the best test of truth is the power of the thought to get itself
> accepted in the competition of the market. Don't underestimate the
> common man. People are intelligent enough to evaluate the source of
> an anonymous writing. They can see it is anonymous. They know it
> is anonymous. They can evaluate its anonymity along with its
> message, as long as they are permitted, as they must be, to read that
> message. And then, once they have done so, it is for them to decide
> what is responsible, what is valuable, and what is truth.

*McIntyre*, 514 U.S. at 348 n.11 (internal quotation marks and citations omitted);

*see also Sampson*, 625 F.3d at 1257-59 (collecting cases and summarizing the

Supreme Court's view of disclosure in a ballot measure issue elections as "such

disclosure has some value, but not that much").

*        *        *

*McIntyre* already rejected the very theories the State uses to make the

informational interest seem important in this case. Without more, the State cannot

demonstrate that the informational interest is important in ballot measure elections.

### C.    No evidence supports the assumption that mandatory disclosure helps voters.

Even if the informational interest could apply to ballot measure speech, the best, most recent published research demonstrates that mandatory disclosure has no marginal benefit to voter knowledge.  The State has produced no evidence to counter that showing.  Accordingly, the interest in educating voters is not actually served by Mississippi's scheme, and that scheme is unconstitutional as applied to ballot measure speech.

To satisfy any level of scrutiny under the First Amendment, government must demonstrate, with actual evidence, that its chosen means directly and materially advance its ends.  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion) (under intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"); *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (under intermediate scrutiny, the government's burden "is not satisfied by mere speculation or conjecture; rather, [the government] must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree"); *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 392 (2000) (the Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden").

Until recently, academics, and therefore also the courts, "have tended to rely on assumptions about" campaign finance disclosure laws.  ROA.1384.  "Academic researchers are only just now beginning to study and estimate the effects of these laws."  ROA.1384; *see also* Elizabeth Garrett, *Voting with Cues*, 37 U. Rich. L. Rev. 1011, 1041 (2003) ("Before we can be confident in drawing conclusions about information and voter competence, however, we need more data.").  Plaintiffs' expert, Dr. David Primo, has studied empirically what others have only made assumptions about to date.[16]

Dr. Primo studied the marginal benefits—a common measurement in political science and economics—of campaign finance disclosure.  ROA.1385.

> The benefits (utility) of campaign finance disclosure laws ought to be assessed [by examining marginal utility].  In other words, given all of the other information already available, how much of an *incremental* benefit do these laws provide?  A failure to engage in marginal analysis leads to an improper measurement of these laws' benefits and may overstate the effects of these laws by attributing to them benefits that are actually derived from information readily available without disclosure.

> A food analogy is useful here.  When considering whether to eat a piece of cake at the end of a meal, one should assess the benefits it will provide, *given all of the food consumed in the meal*, not the benefits it would provide had one not eaten all day.  Campaign finance disclosure laws are often assessed as though voters are "starving" for information.  Marginal analysis correctly takes into account that voters and the media already "consume" significant amounts of information in ballot issue campaigns, and asks whether

---

[16] *See* n.7, *supra*.

the information produced from disclosure provides additional,
measurable benefits.

ROA.1386.

The Supreme Court has struck down laws regulating speech because they
resulted in little marginal benefit. In *Arizona Free Enterprise Club's Freedom
Club PAC v. Bennett*, the government argued that a matching funds program for
candidates deterred corruption. 131 S. Ct. 2806 (2011). But the state already had
several other ways that it combatted corruption and it was therefore "hard to
imagine what marginal corruption deterrence could be generated by the matching
funds provision." *Id.* at 2827. Similarly, in *Brown v. Entertainment Merchants
Association*, the Court noted that "the government does not have a compelling
interest in each marginal percentage point by which its goals are advanced." 131
S. Ct. 2729, 2741 n.9 (2011). Accordingly, the government could not justify a ban
on the sale of violent video games to minors given the many other systems in place
to ensure that minors did not purchase violent games. *Id*. at 2741-42.

Dr. Primo's prior (now published) work demonstrated that there were
"virtually no informational benefits from looking at disclosure-related data" once
participants viewed information provided by news, advertisements, and the voter
guide. ROA.662; *see also* Primo, *Information at the Margin*, 12 Election L.J. at
127 (illustrating "how imperceptible an effect disclosure information has . . . once
the other information they view is taken into account"). He observed that in

60

Mississippi's 2011 election, Mississippians had access to the same kinds of non-disclosure-related information that his study participants had.  Accordingly, he extrapolated from his research findings that the "marginal benefits of disclosure in the 2011 [Mississippi ballot measure] campaign[s] were insignificant."  ROA.664.

In addition, Dr. Primo looked at academic literature studying the burden on political speech and participation in ballot measure elections caused by campaign finance disclosure laws.  ROA.657-60; *see also* Carpenter and Milyo, *The Public's Right to Know Versus Compelled Speech*, 40 Fordham Urb. L.J. at 623-31.  Such research showed disclosure laws like Mississippi's impose real burdens on would-be speakers and deter political speech and involvement.  ROA.657-60.

Ultimately, Dr. Primo concluded that disclosure laws like Mississippi's "provide virtually no informational benefits to voters and create disincentives to speak during ballot measure campaigns."  ROA.665.  The State, however, did not put forward any empirical evidence to counter Dr. Primo's findings or to justify its claimed interest.  Because the only empirical evidence here demonstrates that mandatory disclosure laws do not accomplish what they claim in ballot measure elections, under any level of heightened scrutiny, Plaintiffs prevail.

*        *        *

Should this Court take on the broader issues of first impression raised in this appeal, this Court should affirm the judgment of the district court on alternative

grounds.  This Court should apply strict scrutiny and, for all the reasons set forth in this brief, should hold Mississippi's scheme unconstitutional for all ballot measure committees.  Whether this Court applies strict scrutiny or exacting scrutiny, it should hold Mississippi's scheme unconstitutional for all ballot measure committees because the informational interest cannot carry the State's burden here.

## CONCLUSION

For the foregoing reasons, the district court's judgment, declaring Mississippi's campaign finance scheme unconstitutional as applied to small groups and individuals speaking about ballot measures, should be affirmed.

Dated this 31st day of March, 2014.

                                        Respectfully submitted,


                                        By: s/ Paul V. Avelar
                                        Paul V. Avelar *
                                        INSTITUTE FOR JUSTICE
                                        398 South Mill Avenue, Suite 301
                                        Tempe, AZ  85281
                                        (480) 557-8300

                                        Diana K. Simpson
                                        INSTITUTE FOR JUSTICE
                                        901 North Glebe Road, Suite 900
                                        Arlington, VA  22203
                                        (703) 682-9320

                                        Russell Latino III
                                        WELLS MARBLE & HURST, PLLC
                                        300 Concourse Boulevard, Suite 200
                                        Ridgeland, MS  39157
                                        (601) 605-6900


                                        Counsel for Plaintiffs-Appellees

                                        *Counsel of Record

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I caused this Brief of Plaintiffs-Appellees to be filed electronically with the Clerk of Court using the Court's CM/ECF System and thereby served on the following persons:

Harold E. Pizzetta, III
Assistant Attorney General
State of Mississippi
P. O. Box 220
Jackson, MS  39205
hpizz@ago.state.ms.us

*Counsel for Defendants-Appellants*

J. Gerald Hebert
215 E. Street, N.E.
Washington, D.C. 20002
hebert@voterlaw.com

*Counsel for Amicus Curiae*

Dated this 31st day of March, 2014.

By: s/ Paul V. Avelar
Paul V. Avelar
Counsel of record for Plaintiffs-Appellees

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,998 words, excluding the parts of the brief exempted by Fed. R. App. P 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

Dated this 8th day of April, 2014.

By: s/ Paul V. Avelar
Paul V. Avelar
Counsel of record for Plaintiffs-Appellees